# 2008 DTA 114

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE CAROLINA**
**PANEL XI**

VIRGINIA ACOSTA SÁNCHEZ SU ESPOSO JUAN B. RAMOS NIEVES
Y LA SOC. DE GANANCIALES DE AMBOS
Demandantes-Apelantes

v.

ESTADO LIBRE ASOCIADO DE PUERTO RICIO, DEPARTAMENTO DE EDUCACIÓN
NEDIS RIVERA, EN SU CARÁCTER OFICIAL Y PERSONAL
Demandados-Apelados

Núm. KLAN-2006-01098

San Juan, Puerto Rico, a 17 de septiembre de 2008

Panel integrado por su Presidente, el Juez Ortiz Carrión,
y las Juezas Feliciano Acevedo y Fraticelli Torres

Fraticelli Torres, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Tribunal de Primera Instancia, Sala Superior de Carolina, desestimó la demanda de daños incoada por la apelante Virginia Acosta Sánchez, su esposo Juan B. Ramos Nieves y la sociedad de bienes gananciales compuesta por ellos contra el Estado Libre Asociado de Puerto Rico y la directora de la escuela donde ella trabajaba como maestra, por alegados actos de discrimen, amenaza y persecución contra su persona.

Inconforme con el dictamen, la parte apelante apeló de él ante nos y plantea que el Tribunal de Primera Instancia cometió dos errores: (1) al dictar la sentencia desfavorable sin brindarle la oportunidad de presentar un testigo anunciado y previamente aceptado por el tribunal, lo que constituyó un abuso de discreción; y (2) al desestimar la demanda cuando demostró por preponderancia de la prueba todos los hechos aseverados en la demanda, aun sin el beneficio del testimonio excluido.

Luego de analizar los argumentos de ambas partes y de examinar la transcripción de la prueba oral vertida en el juicio, resolvemos confirmar la sentencia apelada.

Veamos los antecedentes fácticos y procesales que justifican esta determinación.

### I

La parte apelante adujo en su demanda que desde el año escolar 1998-1999 hasta septiembre de 2001, fecha en que inició el pleito, la directora comenzó a exhibir un patrón de conducta discriminante contra su persona. Según la señora Acosta, esa conducta de discrimen, difamación y vejámenes continuó a *"ciencia y paciencia"* de la Región Educativa y del Departamento de Educación y causó que ella se enfermara de los nervios, recibiera tratamiento médico y se diera de baja de la escuela. Por esta situación, su esposo también sufrió daños. Éstas son las alegaciones esenciales de la demanda que debieron probarse en el juicio para prevalecer en la causa de acción.

Luego de varios incidentes procesales, el juicio se celebró el 31 de enero de 2007. Por la parte demandante testificaron la señora Acosta Sánchez y su esposo. Por la parte demandada testificaron la directora Rivera Rodríguez; el señor Oscar Otero Colón, maestro retirado; el señor Milton Garced Santiago, maestro de español; la señora Sandra Muñiz Betancourt, maestra de español; la señora Betty Estrada Navarro, directora de escuela retirada; y la señora Rose Betancourt, maestra de matemática.

Por cuestionarse la suficiencia de la prueba presentada para sostener las alegaciones de la demanda, es necesario exponer de manera detallada los testimonios relevantes vertidos en la vista, relativos al alegado discrimen y hostigamiento.

### A

La señora Virginia Acosta declaró que para 1998-1999 trabajaba como maestra de educación física en la Escuela Intermedia Andrés Valcárcel en Trujillo Alto y que la directora era la señora Nedis Rivera, de quien fue

objeto de persecución, hostigamiento y discrimen. Según ella, hubo persecución porque la directora le negó un horario flexible para poder ir a recoger a sus hijos a la escuela, a pesar de que otros compañeros de trabajo sí podían hacerlo. Señaló, también, que en varias ocasiones tuvo que salir del plantel y que le descontaron ese tiempo. T.E., a las págs. 13-16.

La señora Acosta también testificó que en otra ocasión llegó a las 8:00 de la mañana a la escuela y fue al salón de computadoras a redactar unos exámenes, luego de lo cual regresó al salón de clases a las 9:40 de la mañana —que era la hora en que sonaba el timbre—, donde dio clases hasta las 11:30. Cuando fue a firmar la hoja de asistencia, se percató de que le habían escrito 9:40 como hora de entrada, encima de donde ella había firmado 8:00 de la mañana. Cuando fue a reclamarle a la directora, ella le dijo que escribió 9:40 porque la testigo no estaba en el plantel escolar a esa hora. T.E., a las págs. 16-18.

En cuanto a la aseveración de que se la perseguía, la señora Acosta indicó que si la directora la veía en el pasillo le preguntaba: *"¿Estás dando clases? ¿Dónde t[ú] estabas? ¿T[ú] estaba[s] aquí?"* La testigo también indicó que en otra ocasión la directora la acusó de que ella les había dicho a los estudiantes que ya no iba a dar más clases porque se habían acabado las clases y apenas estaba comenzando el mes de mayo, lo que no era cierto. T.E., a las págs. 18-19.

La señora Acosta también se quejó de que el 20 de enero de 1999 fue víctima de una agresión física en su salón de clases por parte de dos estudiantes de la escuela, llamadas K. A. y N. R. [1] Indicó que en ese momento pasaba un guardia escolar y ella se querelló con él. El guardia llevó a las estudiantes con la directora y ésta no hizo nada al respecto, ni ese día ni al día siguiente, y ni siquiera le preguntó a la testigo sobre el incidente. A esos efectos, testificó que la directora le informó que la mamá de K. A. la había llamado para decirle que envió a su hija a la escuela para que la maestra que le ofreció las bofetadas, se las diera. La testigo señaló, sin embargo, que ella en ningún momento hizo esa manifestación. La señora Acosta narró que procedió a poner una querella con el oficial Ortiz, el guardia estatal. T.E., a las págs. 20-29.

En cuanto a las estudiantes agresoras, la señora Acosta indicó que fueron procesadas en el Tribunal de Menores por agresión física y referidas a un programa de desvío, pero permanecieron en la escuela. La testigo las tuvo que atender, a pesar de que éstas la desafiaban, la retaban, se le cuadraban, se mofaban y se le reían en la cara. La señora Acosta testificó que cuando esto pasaba, ella hablaba con la directora y le informaba que las estudiantes la provocaban y, a pesar de que la directora le decía que hablaría con ellas, ahí quedaba. Ella desconocía si la directora hablaba con ellas. T.E., a las págs. 29-33.

La señora Acosta también declaró que luego de presentar la querella por la agresión, como vio la inacción de la señora Rivera, buscó apoyo del Superintendente Escolar de Trujillo Alto, el señor Juan Sosa, y la Superintendente Interina, señora Petra Otero, pero no fueron a la escuela. La testigo estaba en un estado de crisis nerviosa, porque se acercaba la fecha en que las estudiantes tenían que retornar al plantel, luego de estar suspendidas durante tres días. Ese día, como se sentía nerviosa, desesperada e intranquila, firmó la hoja de asistencia, se retiró de la escuela y se fue a su casa. Llamó llorando a su esposo a la escuela donde éste trabajaba y él la llevó al Fondo del Seguro del Estado, donde la medicaron y le mandaron descanso.

En los días de descanso, la señora Acosta pudo reunirse con los Superintendentes Escolares y les explicó la situación de inacción de la señora Rivera ante la agresión física de las estudiantes. Además, les solicitó que removieran de la escuela a las estudiantes, debido a que la directora sólo las había suspendido por tres días. Ellos quedaron en investigar el caso *y como ella les dijo que no podía esperar*, le contestaron que hiciera lo que creyera pertinente. Entonces, la testigo fue al Departamento de Educación a presentar una querella contra la señora Rivera por su inacción ante la agresión sufrida a manos de las dos estudiantes. [2] T.E., a las págs. 35-41.

La testigo relató otros incidentes que tuvo con el señor Oscar Otero, maestro de Artes Industriales, a quien ella consideraba un estrecho colaborador de la directora. Entendió que en ambas ocasiones él le faltó el respeto. La directora quedó en hablar con él, pero ella desconocía si así lo hizo. Según la apelante, la directora nombró al señor Otero como maestro encargado del plantel escolar y él se tomaba los atributos de mandar, de perseguir al personal y de supervisarlos. Cuando la directora faltaba, él hacía el trabajo administrativo de ella y le impartía instrucciones a los maestros. T.E., a las págs. 42-45.

En cuanto a la querella por inacción presentada contra la directora, la señora Acosta testificó que nadie hizo nada, ni el Departamento de Educación, ni la Superintendencia del Distrito Escolar. Nadie la citó ni investigó. El señor Víctor Fajardo, Secretario de Educación, no encontró causa alguna para amonestar a la señora Rivera. No obstante, la señora Acosta señaló que, a raíz de la querella, continuaba el hostigamiento, el discrimen y la persecución hacia ella por parte de la señora Rivera y del señor Otero, consistente en que le seguían preguntando dónde ella estaba, si estaba dando clases o no, lo que hacían "*para perseguirla*". T.E., a las págs. 48-52. Ante su desesperación, fue a una entrevista para una plaza de maestra de escuela elemental y aceptó la plaza para el año escolar 1999-2000 en otra escuela. T.E., a las págs. 52-61.

Luego de transcurrido ese año escolar, la señora Acosta regresó a su plaza en la Escuela Andrés Valcárcel. A su regreso, la señora Rivera le dijo que había perdido su *seniority*, que no tenía salón de clases y que tenía que compartir la cancha. La señora Acosta fue donde la señora Luz Nereida Medero, Delegada del Taller de la Federación de Maestros, quien era la persona encargada del asesoramiento y de las intervenciones cuando había problemas con un director. La señora Medero fue donde la directora y le explicó que el derecho de antigüedad no se perdía porque un maestro estuviese en un puesto transitorio en otro lugar. Entonces le dieron el salón y le respetaron el derecho de antigüedad ante otro compañero. T.E., a las págs. 61-65.

La señora Acosta solicitó entrar en la carrera magisterial, es decir, estudiar la maestría, para lo que necesitaba un horario flexible. La directora le indicó que tenía que llevarle la matrícula de la institución, como evidencia de que estudiaba, para autorizarle lo pedido. Le llevó una certificación de estudios y la matrícula, pero la directora le exigió que le llevara el horario de clases, a lo que ella se negó, porque a otro maestro se lo concedieron sin esa evidencia. [3] La señora Acosta presentó una querella a la Federación de Maestros que, a su vez, presentó la querella ante el Departamento de Educación, pero la agencia no la contestó. La señora Acosta se fue a trabajar a la Escuela Petra Zenón de Faberí en 2001. T.E., a las págs. 66-77.

Otro incidente relatado como hostil fue el relacionado con la hija de la señora Sandra Muñiz, maestra de español del mismo plantel escolar. La testigo narró que la señora Muñiz le informó que su hija sufrió un accidente hacía años y se había lastimado la espalda, por lo que no podía hacer cierto tipo de ejercicios. La señora Acosta le pidió un certificado médico, cosa que avaló la directora, para modificarle las exigencias de la clase, pero la maestra Muñiz no se lo trajo a ella. Mientras, la estudiante observaba las prácticas de la clase y permanecía sentada cuando salían a la cancha a hacer ejercicios, aunque luego se integró voluntariamente a la actividad física. La madre de la estudiante no envió más a su hija a la clase, por prescripción médica, aunque le faltaban algunos exámenes escritos. El certificado médico estaba grapado a la hoja de asistencia de la estudiante, sin que ella lo supiera. Por instrucciones de la directora, se ajustó la nota del primer semestre a base de las pruebas que ya tenía y obtuvo la calificación de "B". T.E., a las págs. 80-92.

El segundo semestre la estudiante no volvió a la clase y le planteó el asunto a la directora, quien le indicó que si no cogía clase, no se graduaba, pero el incidente terminó con una querella de la señora Muñiz contra la señora Acosta porque no aceptaba la nota que se le iba a adjudicar a su hija. A raíz de esa querella se afectó emocionalmente y se descontroló de los nervios, por lo que tuvo que ir a una siquiatra, la Dra. Eileen Rojas, y estuvo tres años tomando medicamentos. Según la testigo, se afectó su relación marital, su núcleo familiar y se afectó ella como profesional, como persona y como mujer. Al momento de su testimonio, la señora Acosta ya no tomaba medicamentos. T.E., a las págs. 92- 103.

En el contrainterrogatorio, la señora Acosta reiteró que estuvo en la Escuela Valcárcel desde 1992 hasta 1999, que se fue a otra escuela, pero regresó en 2000-2001. Declaró que la señora Rivera comenzó a laborar en la escuela en 1997 y que no tuvo problema alguno con ella hasta 1999, en que sufrió la agresión física de parte de las dos estudiantes. Se le preguntó a la señora Acosta si le envió algún comunicado a la directora respecto a esa situación y si la directora se lo contestó. La testigo contestó en la negativa y fue confrontada con dos documentos: una carta que ella le escribió a la directora el 26 de enero, en la que le indicó que estaba decepcionada con ella porque no hizo nada respecto a la situación de agresión de las estudiantes; y la contestación de la directora, en la que le indicaba a la señora Acosta el trámite que tenía que seguir para querellarse. La señora Acosta indicó que firmó la hoja de trámite, pero no la carta que acompañaba esa hoja de trámite. T.E., a las págs. 106-113.

En otra parte del contrainterrogatorio se le preguntó a la testigo si a las estudiantes se les aplicaron medidas disciplinarias en la escuela, a lo que ésta contestó que sí. También testificó que no sabía lo que se necesitaba para expulsar a algún estudiante de la escuela del sistema público ni quién tenía el poder para hacerlo; que no sabía que la directora de una escuela no tenía ese poder; que le indicó a la directora que las estudiantes eran de una zona distinta a la de la escuela; que las estudiantes fueron halladas incursas en falta y que la juez les indicó que iban a permanecer en la escuela y que tenían que tener una disciplina intachable, sin embargo, aunque luego la desafiaban, ella no fue al tribunal a informar esa situación porque desconocía el proceso; y que ella lo que quería era que la directora detuviera los actos de las estudiantes. Admitió que luego de ir varias veces a la directora, los actos cesaron, culminó el año escolar y todo terminó ahí. La señora Acosta expresó que ella lo que quería era que la directora reuniera a todas las partes involucradas, entre ellas, a las madres de las estudiantes, y las amonestara para que cesaran y desistieran de su conducta. T.E., a las págs. 113-118.

En cuanto al incidente en el salón de clases, se le preguntó si ella sabía quién era la persona que estaba a cargo de distribuir los ayudantes a los maestros que iban a dar las pruebas y la señora Acosta contestó que era la directora de la escuela. Se le preguntó nuevamente quién era la persona designada para asignar los maestros que iban a ayudar a los otros maestros a suministrar las pruebas y la testigo indicó que no sabía. La señora Acosta indicó que en relación con ese asunto, el Departamento nada hizo; y que no recordaba que un investigador del Departamento hubiese ido a la escuela a investigar el asunto del señor Otero. T.E., a las págs. 121-123. En cuanto al alegado manoteo del señor Otero, la señora Acosta relató nuevamente lo ya dicho. Al preguntársele a la testigo si creía que él le iba a dar, la testigo admitió que no. T.E., a las págs. 125-126.

En la continuación del contrainterrogatorio, la señora Acosta aceptó que la directora no le negó categóricamente el horario flexible, sino que le dio unas instrucciones y le pidió la certificación de estudios, pero no la orientó. Luego admitió que la directora la orientó al respecto por escrito, aunque el horario especial nunca se dio. T.E., a las págs. 127-130.

Sobre el asunto de la estudiante Yaritza Montañez Muñiz, la testigo indicó que no hubo una resolución en su contra sobre esa querella. T.E., a las págs. 132-135. Se le volvió a preguntar porqué el E.L.A. tenía que ser culpable de la querella incoada por la señora Sandra Muñiz, si el Departamento de Educación debía investigar toda querella presentada con razón o sin razón. La testigo contestó que eso era correcto. Se le preguntó a la señora Acosta si ella dijo que iba a colgar a la estudiante y ésta contestó que eso era incorrecto. También, se le cuestionó si todo el mundo sabía que la estudiante tenía impedimentos porque sufrió un accidente en sexto grado y tenía una fractura en la columna vertebral. La señora Acosta contestó que eso era correcto, que se enteró y que era cierto que no hacía falta la cosa burocrática de traerle un certificado médico, porque todo el mundo sabía que ella tenía problemas con la espalda. La señora Acosta reiteró que la niña participó voluntariamente en la clase, ya que ella nunca le exigió nada; que ella le dio clases de agosto a diciembre de 2000 y que la querella fue en 2001.

En cuanto a la pregunta de si ella le dijo a alguien que la estudiante tenía "F" y que no iba a pasar de clase,

la señora Acosta declaró que ella le dijo a la directora que la estudiante no asistía a clases y que fue la propia directora la que le dijo que si no tenía el curso aprobado, tenía "*F*". Según la testigo, para marzo, la estudiante no había asistido a la clase y fue en abril cuando la removieron de su salón y le pidieron que pasara a otro maestro la asistencia y las notas que tenía acumuladas. La señora Muñiz fue al salón de la señora Acosta y la insultó, la hostigó y le "*dijo veinte cosas*", entre ellas, que la iba a acusar ante el Departamento de Educación. Ella le recomendó que fuera donde la directora a pedir una dispensa.

Por la parte apelante también testificó el señor Juan Bautista Ramos Nieves. Éste declaró que era maestro de educación física en la Escuela Martín González en Carolina desde agosto de 1990; que era esposo de la señora Virginia Acosta Sánchez desde el 2 de agosto de 1990 y que tenían dos hijos. Al preguntarle cómo él se sintió ante toda la situación narrada por ella y lo que hizo para tratar de minimizar la situación, contestó que él acompañaba a su esposa a la siquiatra, debido a que ella no podía conducir en el estado en que estaba; que la acompañó como tres o cuatro veces y que hubo como otras seis visitas en las que él no la acompañó. T.E., a las págs. 4-7.

Se le preguntó al señor Ramos cuál era el comportamiento de la señora Acosta en el hogar a la luz de estos hechos y éste contestó que ella siempre estaba nerviosa, irritable y que él se tuvo que hacer cargo del hogar porque ella no estaba muy bien emocionalmente. Asimismo, testificó que en julio de 2000 se enlistó en la Guardia Nacional de Puerto Rico y participó en las prácticas militares (*drills*) de fin de semana en agosto, septiembre y octubre; que en octubre de 2000 ingresó a la Escuela de Idiomas (*Language Center*) en Juana Díaz y allí se desempeñó muy bien, pero los viernes tenía que regresar a su hogar para irse el domingo y cuando llegaba al hogar se encontraba con situaciones no deseadas; que él estaba un poco afectado por la situación en que se encontraba su esposa; que cuando les daban la oportunidad de llamar a los hogares, el tono de voz de su esposa era como si estuviera fuera de sí y eso lo afectó grandemente; que tuvo que abandonar las Fuerzas a principios de noviembre de 2000 y le dieron un *discharge*; que por esa situación se ha sentido sumamente mal e indicó que, a veces, hasta incapacitado; que la relación entre él y su esposa se afectó; también los niños se afectaron debido a que ellos se percataron de que su mamá estaba mal; cuando él venía los viernes, ellos se lo decían, principalmente su hijo mayor. T.E., a las págs. 7-10.

El juez le pidió que especificara a lo que se refería al decir que los niños estaban afectados, ya que eso era algo bien general. El señor Ramos contestó que ella tenía un corre y corre con los niños por no habérsele concedido el horario especial para cumplir con su carrera magisterial cuando ya ella había empezado los estudios universitarios postgraduados; y que los niños veían la condición en la que ella se encontraba y cuando él venía los fines de semana el hijo mayor le decía que su mamá, a veces, cuando lo recogía y conducía lloraba. T.E., a las págs. 10-11.

Ésta fue la prueba presentada por la parte apelante para probar sus alegaciones de discrimen y hostigamiento por parte de las partes demandadas.

**B**

La parte apelada presentó como testigo a la señora Betty Estrada Navarro, quien se retiró de ser Directora de Escuela en 2005. En lo que es pertinente al recurso, testificó sobre los atributos personales y profesionales de la señora Nedis Rivera, porque esta última se desempeñó como maestra bajo su supervisión, hasta que la señora Rivera aceptó un puesto como Directora de Escuela. T.E., a las págs. 3-5. Calificó a la señora Rivera como una excelente maestra; que colaboraba, no solamente con el personal de la escuela, sino también con las madres y con los niños; que su relación con los maestros y el personal era excelente; que era una persona objetiva y pacífica que apenas le llevaba situaciones con las cuales no podía lidiar y que resolvía sus problemas en su salón; que apenas se ausentaba; tenía buena relación con los demás compañeros de trabajo; que iba más allá de su deber en sus funciones como maestra y que no recibió quejas de ella. La testigo indicó que no conocía a la señora Virginia Acosta Sánchez. T.E., a las págs. 5-7.

En el contrainterrogatorio, se le preguntó a la testigo si ser director escolar acarreaba unas responsabilidades y unas cosas muy distintas a ser un maestro, por lo que el único testimonio que ella podía verter sobre la señora Rivera era como maestra de primer grado y no como directora escolar. La testigo contestó que sí. También indicó que no podía declarar sobre los incidentes alegados, porque ella no estaba en la escuela. T.E., a la pág. 12.

El señor Oscar Otero Colón testificó que se retiró en mayo de 2004, luego de haber trabajado por treinta y cuatro años como maestro de artes industriales en la Escuela Andrés Valcárcel. Ya llevaba nueve años en la escuela cuando entró como directora la señora Nedis Rivera, aproximadamente en 1995. Declaró que el desempeño de la señora Rivera era muy profesional, que *"bregaba bien"* con todo el personal al igual que con los estudiantes; que él no vio nunca que ella maltratara a nadie; que el trato con él era como con cualquier otro maestro, bien profesional; que él estuvo como Maestro Encargado de la escuela y, como tal, representaba a la directora en su ausencia cuando había algún problema de disciplina y, a veces, recibía las pruebas puertorriqueñas de español, matemática e inglés. T.E., a las págs. 4-8.

El testigo indicó que conocía a la apelante Virginia Acosta Sánchez y que habían tenido una amistad muy buena; una vez él tuvo un accidente y ella lo llevó al hospital. Luego la amistad cambió y ella no le daba ni los buenos días. Él pensaba que era porque él era el Maestro Encargado y estaba al lado de la directora. Según el testigo, había una situación entre la señora Acosta y la directora por la forma en que la primera pedía los materiales y la directora le contestaba que no había dinero y que había que hacer un presupuesto. Finalmente, le preguntaron al señor Otero si se habían suscitado otras situaciones entre la directora y otros compañeros y el testigo contestó que no recordaba ninguno. T.E., a las págs. 9-15.

El señor Milton Garced Santiago declaró que era maestro de español secundario en la Escuela Andrés Valcárcel en Trujillo Alto desde 1991; que trabajó en 1988 y 1989 en Naguabo y en 1990 estuvo en la Escuela Rafael Cordero; que conocía a la señora Nedis Rivera porque ésta era su jefa inmediata en la Escuela Andrés Valcárcel. T.E., a las págs. 2-5. Respecto al desempeño profesional de la señora Nedis Rivera, el señor Garced indicó que su relación con ella era de jefa a empleado, de directora a maestro; que él le llevaba a ella sus inquietudes, luego de un estudio de necesidades y unas pruebas que daba a principios del semestre, y ella siempre lo apoyaba, al igual que lo hacía en distintas actividades, tal como la Semana de la Lengua; que ella siempre estaba ávida de escuchar y no recordaba que le hubiese dicho que no a algún proceso; y que su experiencia con ella siempre fue positiva. En cuanto a la forma en que la directora se desempeñaba con los estudiantes, el testigo indicó que era una persona cooperadora, respetuosa, que siempre escuchaba al joven y estaba atenta a sus necesidades. Respecto a la forma en que trataba a los maestros, el señor Garced señaló que daba unas directrices y había que seguirlas y que la relación con ella era normal, cordial, con respeto. T.E., a las págs. 7-10.

Se le preguntó al señor Garced por el señor Oscar Otero y éste indicó que lo admiraba mucho; que cuando el testigo llegó a la escuela, ya el señor Otero estaba allí; que era un maestro excepcional, afable, cariñoso con sus estudiantes y compañeros, siempre dispuesto a colaborar en todas las actividades de la escuela en la medida en que podía servir; y que cumplió sus años de servicio con mérito. T.E., a las págs. 10-11.

Respecto a la señora Acosta, el señor Garced testificó que cuando él llegó a la escuela, ya ella estaba allí; que trabajaron conjuntamente; que ella logró traer premios deportivos a la escuela con sus grupos; que compartía con ella también en la Sala de Facultad de Maestros, donde ella se involucraba en actividades y colaboraba en un club que tenían. Se le preguntó si sabía de algún incidente que le hubiese llamado la atención en relación con la señora Acosta y el señor Garced contestó que no. T.E., a la pág. 12.

En el contrainterrogatorio, el señor Garced declaró que la señora Acosta se involucraba en las actividades extracurriculares y que algunas de esas actividades terminaban luego de las tres de la tarde, que era la hora de

salida de la escuela, y otras eran en la noche y no se les pagaba a los profesores por eso. T.E., a las págs. 13-15.

La apelada Nedis Rivera Rodríguez también prestó testimonio y declaró que se desempeñaba en el puesto de Directora de la Escuela Andrés Valcárcel de Trujillo Alto desde enero de 1997; que conocía a la señora Virginia Acosta Sánchez por ésta desempeñarse como maestra en esa escuela; y que el desempeño de la señora Acosta era *regular*, igual que otros maestros. (Más adelante aclaró que quiso decir *normal*, no que fuera deficiente.) Declaró que el único incidente que tuvo con la señora Acosta fue la demanda por la cual se encontraban en el tribunal; que leyó la demanda y decía que ella no le proveía materiales, que la hostigaba, la maltrataba y una serie de incidentes. En cuanto a lo aseverado en la demanda, la señora Rivera indicó que eso no era correcto; que ella nunca la maltrató; que ella no le podía proveer materiales porque la escuela no contaba con un presupuesto estatal para poder comprarle materiales; que había un presupuesto federal que estaba destinado a los maestros de inglés, español y matemática y la señora Acosta no estaba en esa área; que ella se quejaba por eso; y que a veces se generaban unos fondos de matrícula y había que compartirlos entre todos y muchas veces ella, como directora, sacaba de su bolsillo para cubrir algunas áreas que ella entendía que tenían emergencia. T.E., a las págs. 3-6.

Sobre este asunto declaró en el contrainterrogatorio que era correcto que la señora Acosta le hizo una requisición porque no tenía materiales para dar clases, al igual que otros maestros, y ella les dio hasta donde podía darles y eso fue quizás para unas bolitas de ping-pong. Los fondos que recibía la escuela no podían utilizarse en educación física ni otras materias. T.E., a las págs. 27-30.

Respecto a la solicitud de horario flexible de la apelante para la carrera magisterial, la señora Rivera declaró que ella le dijo a la señora Acosta que tenía que mostrar evidencia de la matrícula de la universidad para poder hacerle un horario especial. La testigo se acercó a la señora Milagros Aponte, Directora de la Región Educativa de San Juan, quien le indicó que ella misma como Directora Regional tuvo que presentar evidencia para que sus superiores le pudiesen dar un horario especial. Entonces la testigo asesoró por escrito a la señora Acosta al respecto. La señora Acosta cumplió con ese requisito y ella le hizo un horario. En cuanto al tiempo que transcurrió entre el momento en que la señora Acosta le proveyó la evidencia y el momento en que ella le hizo el horario pasaron tres meses porque lo solicitó en enero del 2000 ó 2001 y la señora Acosta llevó la evidencia en marzo o principios de abril. El horario que la testigo le aprobó fue de siete de la mañana a dos de la tarde. T.E., a las págs. 6-10.

En el contra declaró que la carrera magisterial tenía que hacerse sin incidir en el horario escolar; que ella no podía hacer excepciones; y que nunca hizo excepción para maestro alguno; que el señor Adalberto Rodríguez no estaba en carrera magisterial; y que cuando la señora Acosta le llevó la evidencia, ella inmediatamente le preparó un horario que no incidía en el horario escolar. T.E., a las págs. 30-33.

En cuanto al incidente de agresión de las estudiantes, la señora Rivera declaró que durante el cambio de clase se formó una pelea de estudiantes cerca del área donde la señora Acosta impartía la clase de educación física. La señora Acosta le envió las estudiantes a la directora con el policía de la escuela. Cuando la directora entrevistó a las estudiantes, ellas le dijeron que la maestra les había dado confianza. La directora les ordenó a las estudiantes que fueran a disculparse con la señora Acosta, pero la maestra no aceptó las disculpas. La señora Acosta llamó entonces a la madre de la estudiante K. A. y a la persona encargada de N. R., pero no las encontró. La testigo procedió a citarlas para el día siguiente, so pena de suspensión. Al día siguiente compareció la madre de K. A., pero no la madre de N. R. T.E., a las págs. 10-12.

La señora Acosta procedió a presentar una querella contra las estudiantes y el caso de vio en el tribunal, donde la directora testificó que había suspendido a las estudiantes por tres días, que era el procedimiento que ella normalmente seguía. Explicó que el único que tenía el poder para expulsar a las estudiantes de la escuela era el Secretario de Educación. La juez regañó a las estudiantes y las puso bajo vigilancia de un trabajador

social. La señora Rivera testificó que ahí quedó todo y que no recibió queja posterior alguna. T.E., a las págs. 12-14. En el contrainterrogatorio sobre este asunto, la señora Rivera reiteró lo dicho en el directo. Añadió que las niñas volvieron al salón de clases porque la juez le indicó a la maestra que, como eran candidatas a graduación de noveno grado, tenían que volver al salón de clases. Allí quedaron en la misma situación en que estuvieron antes. T.E., a las págs. 33-38.

A la señora Rivera también se le interrogó sobre el asunto de la asistencia de los maestros y el descuento de horas. Ésta declaró que los maestros trabajaban de 8:00 a.m. a 3:00 p.m. y que a las 8:00 a.m. se suponía que estuviesen en su salón de clases; que muchas veces a las 8:00 a.m. el maestro no estaba ni siquiera en la escuela, ya que tenían la mala costumbre de llegar tarde y firmar temprano; y que casi todos los maestros tenían ese problema. Ella le daba diez minutos de gracia a un maestro cuando tenía una emergencia, pero no todos los días. En cuanto a su experiencia con la señora Acosta, la señora Rivera indicó que ésta también llegaba tarde alguna veces, al igual que la mayoría de los maestros; que ella le decía que tenía que llegar temprano; que le ponía un bracket en tinta roja en la hoja de asistencia; y que casi todos los empleados tenían esa costumbre y ella les marcaba la hoja de asistencia con tinta roja. La señora Rivera explicó que cuando llegó al plantel escolar le costó trabajo que los maestros cumplieran con el horario; y que la mayoría de los maestros le daba como excusa de las tardanzas el uso y costumbre. Finalmente, en cuanto a este asunto, se le preguntó si la señora Virginia Acosta también estaba incluida entre esos maestros y la testigo contestó en la afirmativa. T.E., a las págs. 14-16; T.E., a las págs. 38-39.

Sobre el incidente de la hija de la maestra Sandra Muñiz, la testigo declaró que la niña sufrió un accidente y se fracturó la columna vertebral y como consecuencia de ello no podía subir ni bajar escaleras, ni hacer movimientos bruscos, porque podía quedar paralítica. Se solicitó que la niña fuera parte del área de educación física a través de exámenes, ya que no podía hacer ejercicios de clase alguna. T.E., a las págs. 16-19.

La señora Rivera declaró que la señora Muñiz le notificó la condición de su hija en agosto del año en que la niña comenzó a coger clase y que la señora Rivera se lo notificó a la señora Acosta. A su vez, avanzado el semestre, la señora Nelly Betancourt, maestra de salón hogar de la estudiante, le envió una carta a la señora Acosta donde le detallaba la condición de salud de esa niña y de otros dos estudiantes que participaban de la clase de educación física. Según la testigo, el primer semestre no hubo reacción, por lo que acudió al señor Heriberto Crespo, director de Campo de la Región Educativa de San Juan. Éste autorizó el traslado de esos estudiantes a la clase de otro maestro, el señor Rodríguez, aunque ya la directora había trasladado a la estudiante Muñiz al comienzo del semestre. T.E., a las págs. 19-22.

En el contrainterrogatorio y el redirecto, la testigo amplió el relato, y se le confrontó con documentos que indicaban que aún en abril de ese año estaban lidiando con ese traslado a otro maestro, lo que implicaba que la niña aún estaba a mediados de semestre en la clase de la demandante. T.E., a las págs. 45-48; 49-55; 56-57, 58-59. Sí admitió que no podía decir si la señora Acosta obligó a la estudiante a hacer ejercicios que no le correspondía hacer. T.E., a las págs. 40-45.

La señora Rivera también testificó que su relación con la señora Acosta era de jefa y empleada y que no compartía con ella en el plano personal o de amistad. Negó las imputaciones de persecución y hostigamiento que allí se hacían, a pesar de que no la contestó. Declaró que nunca ha perseguido ni maltratado a ningún maestro; y que ésa no era la única demanda que había en contra de ella por esos hechos. T.E., a las págs. 24-27.

La señora Sandra Muñiz Betancourt testificó que era maestra de español en los grados séptimo y octavo en la Escuela Andrés Valcárcel desde el 2000, año en que conoció a la señora Acosta. Ésta fue la maestra de educación física de su hija Yaritza de agosto a diciembre del 2000; y que luego de eso su hija tomó clases con el señor Rodríguez, maestro de Educación Física, a petición de la testigo en enero del 2001. T.E., a las págs. 3-7.

La señora Muñiz narró detalles de la condición de su hija y, en lo relevante al caso, declaró que, conociendo la señora Acosta la condición de su hija, la obligó a jugar voleibol y su hija estuvo dos semanas postrada en cama con mucho dolor y calambre. T.E., a las págs. 7-10. Al cuestionarle porqué hizo una cosa como ésa, la señora Acosta le contestó: *"Bueno, pero es que los nenes hay que ponerlos a jugar"*. Alegó que la apelante también mandó a su hija a bajar las escaleras para tomar el examen final, contra las recomendaciones médicas. T.E., a las págs. 10-11. Entonces, solicitó que se cambiara a su hija de su clase, lo cual se hizo. La juez le preguntó a la testigo porqué no se matriculó a Yaritza desde el inicio en una clase de Educación Física que fuera para niños especiales. La señora Muñoz contestó que al dialogar con la señora Acosta, ésta le señaló que podía trabajar con el caso. T.E., a las págs. 11-17.

En cuanto a su relación con la señora Acosta, la señora Muñiz indicó que al comienzo fue una buena relación porque dialogó con ella y entendió la situación de su hija. Sin embargo, luego se sintió un poquito incómoda y muy afectada al saber que la vida de su hija estaba en riesgo. La juez le preguntó qué fue lo que hizo la señora Acosta para poner en riesgo la vida de su hija y la señora Muñiz contestó que la obligó a jugar voleibol cuando estaba escrito que no podía hacerlo. T.E., a las págs. 17-19.

En cuanto al aprovechamiento académico, la señora Muñiz indicó que su hija era una excelente estudiante en séptimo grado y que todavía en la universidad tenía todas *"A"*. Luego apareció una carta de la señora Acosta en la que su hija tenía cuarenta ausencias y cortes y que tenía *"F"*, a pesar de que la maestra Acosta ya sabía que su hija tomaba clases con otro profesor. Añadió que su hija se sentía perseguida y que llegaba a la casa llorando y preocupada por sus notas y se frustró. La señora Muñiz se lo notificó nuevamente a la directora y ella procedió a dialogar con el señor Crespo en el Departamento de Educación y bajó el cambio oficial, pero la señora Acosta seguía con la insistencia de que le iba a poner una *"F"* a su hija, por lo que la señora Muñiz presentó una querella en contra de la señora Acosta en el Departamento de Educación. T.E., a las págs. 19-21.

Sobre este asunto, la juez le preguntó si lo que ella decía era que mientras su hija tomaba clases con el profesor Rodríguez en un acomodo razonable desde enero del 2001, a la misma vez, la señora Acosta evaluaba a su hija por no encontrarse físicamente en su salón de clases. La señora Muñoz contestó que ahí se veía la persecución de la maestra Acosta hacia su hija porque le mandó siete *"Fs"*, cuando ella tenía conocimiento de que su hija estaba con otro maestro. En cuanto a si se le informó a la señora Acosta que su hija ya no era estudiante de ella porque había pasado con el profesor Rodríguez, la señora Muñiz contestó que sí, que había una carta que le envió la directora y se recurrió al Departamento de Educación y se originó el cambio completamente, para que la señora Acosta desistiera de la situación. Hizo referencia al comunicado de 3 de marzo de 2001. T.E., a las págs. 45-48. La testigo contestó que no sabía si había documentos previos o si el traslado se hizo de boca. T.E., a las págs. 50-51.

La señora Muñiz no podía decir si la señora Acosta era una maestra problemática, porque no sabía lo que ella hacía en su salón de clases. Tampoco podía decir si la señora Acosta tenía problemas con la directora. T.E., a la pág. 57.

El último testigo presentado por la parte apelada fue la señora Rose Betancourt, quien testificó que era maestra de matemática desde hacía veinte años en la Escuela Andrés Valcárcel; que ayudaba en el proceso fiscal de la escuela; que conocía a la directora de la escuela, señora Nedis Rivera, y la consideraba buena directora. T. E., a las págs. 3-5. Sobre el proceso fiscal, que funcionaba como un comité, la señora Betancourt declaró que ella era la pagadora. Relató asuntos relativos al manejo del presupuesto de una escuela de la comunidad. Hasta 2003-2004 sólo podían solicitar fondos del presupuesto federal los maestros de Título I, español, inglés y matemática. En 2003-2004, el sistema cambió a *"school-wide"* y los demás maestros podían obtener presupuesto mediante una petición en la que cada maestro decía cuáles eran sus necesidades, a base de las cuales se hacía el presupuesto narrativo de la escuela. T.E., a las págs. 5-7.

La señora Betancourt testificó que la señora Acosta se le acercó y ella le indicó que ni en el presupuesto federal ni en el estatal venía una partida dirigida al área de Educación Física, ni para los maestros de Ciencias ni de Estudios Sociales, por lo que no era una situación de Educación Física solamente. En el contra reiteró que la directora hacía el narrativo sobre las partidas en las que se iba a gastar el dinero, según las necesidades de la escuela, y que no había partida alguna para Educación Física. Ni la señora Dougherty ni el señor Rodríguez, los otros dos maestros de Educación Física, se le acercaron a ella para hacer peticiones económicas. En cuanto a la pregunta de si eso constituía una violación al reglamento del Departamento de Educación, la testigo contestó que eso lo sabía el Departamento. T.E., a las págs. 20-22.

También comentó el incidente con las estudiantes agresoras, aunque no aportó nada nuevo a lo ya relatado. T. E., a las págs. 7-9. En cuanto a la pregunta de si alguien en la escuela maltrató a la señora Acosta, la testigo indicó que entendía que nadie. T.E., a las págs. 10-13. Aunque originalmente testificó que la señora Acosta le exigía a Yaritza como a cualquier estudiante del salón, aun sabiendo que tenía una condición de salud especial, T.E., a las págs. 13-15, luego declaró que no la vio haciéndolo. T.E., a las págs. 26-27. Finalmente, la señora Betancourt declaró que entendía que lo que se decía en la demanda era falso T.E., a la pág. 29. Ésta fue la prueba testimonial de la parte apelada.

Según la minuta de 1ro de febrero de 2006, se admitió como prueba documental, por estipulación de las partes, la carta de 3 de marzo de 2001 dirigida por la señora Rivera a la señora Acosta, sobre el incidente de la agresión de las estudiantes. También se admitió la carta suscrita por la señora Rivera a la señora Acosta, fechada 3 de abril de 2001. Como prueba de impugnación de los demandantes, se admitió la Hoja de Trámite de la carta de 3 de abril del 2001. Esa hoja de trámite está dirigida a la señora Acosta, de parte de la señora Rivera, y en el asunto aparece lo siguiente: Entrega de carta, Movimiento de Matrícula, Henry Hernández, Yaritza Montañez Muñiz. En el Informe de Conferencia con Antelación al Juicio, en la parte de prueba documental, aparecen tachados por la juez los informes médicos de la demandante y cualquier otra prueba que debió ser anunciada antes del juicio. Por tal razón, los récords médicos del Fondo del Seguro del Estado no obran en autos.

## II

Como indicado, en su primer señalamiento de error, la parte apelante cuestiona la decisión del Tribunal de Primera Instancia de reconsiderar *motu proprio* la autorización que concedió previamente a la parte apelante para sustituir a una testigo anunciada que falleció antes del juicio por la señora Luz N. Carrasquillo. El tribunal *a quo* reconsideró su decisión y denegó la presentación de la testigo mientras ésta estaba presente y dispuesta a ocupar la silla de los testigos. Según la parte apelante, esa actuación del foro sentenciador no sólo fue injusta, arbitraria y caprichosa, sino que también constituyó un abuso de discreción. Asimismo, arguye que el tribunal *a quo* privó a la parte apelante de una verdadera vista en los méritos. No tiene razón.

El 5 de enero de 2006, la parte apelante presentó la *"Moción Informativa y Anunciando Inclusión de Testigo"* en la que le informó al Tribunal de Primera Instancia que la señora Lydia Príncipe había fallecido por lo que era necesario incluir como testigo a la señora Luz N. Carrasquillo, quien tenía conocimiento personal de los hechos alegados. El 19 de enero de 2006, el Tribunal de Primera Instancia declaró con lugar la moción y le ordenó a la parte apelante citar a la testigo para las fechas del juicio. Esa orden fue archivada en autos el 26 de enero de 2006, pero dos días antes de que el tribunal *a quo* notificara la orden, la parte apelada presentó una moción urgente para la *"exclusión de evidencia"*, en la que solicitó que no se permitiera el testimonio de la nueva testigo anunciada. Argumentó que en la deposición tomada a la apelante Acosta se le preguntó sobre algún otro testigo que ella tuviera para apoyar las aseveraciones de la demanda y ésta no mencionó a la señora Luz N. Carrasquillo. Señaló que ésta a quien mencionó fue a la señora Lydia Príncipe, a la señora Luz N. Medero Carrasquillo y al guardia escolar.

El día del juicio, cuando la parte apelante le anunció al tribunal que el nombre correcto de la testigo era Luz N. Medero y no Luz N. Carrasquillo, el tribunal reconsideró su orden y denegó la presentación. Al revocar su

decisión previa de autorizar a la nueva testigo, el tribunal *a quo* consideró que, aunque el fallecimiento de la testigo anunciada fue una situación imprevista, permitir la inclusión de una nueva testigo a 8 días del juicio era una situación sorpresiva para la parte apelada, a la cual ya no le era viable realizar ningún tipo de descubrimiento de prueba sobre el testimonio que ésta prestaría. Tomó en consideración que la demanda en este caso se presentó el 10 de septiembre de 2001 y que ya habían transcurrido casi cinco años, por lo que la decisión de suspender el juicio para permitir el descubrimiento de prueba hubiese causado todavía una mayor dilación del proceso.

Por otro lado, la parte apelante arguye que el hecho de que el Tribunal de Primera Instancia no permitió que la señora Medero declarara, afectó el desenlace de su caso. Adviértase, sin embargo, que del testimonio de la apelante Acosta surge que la señora Medero habría testificado sobre la negativa a reconocer su derecho de antigüedad, que efectivamente se le honró con su intervención, y sobre las dificultades relativas a su solicitud de horario flexible para la carrera magisterial, beneficio que también se le concedió luego de proveer la evidencia de estudios que se le solicitó.

El Tribunal de Primera Instancia no abusó de su discreción al denegar la presentación de la testigo. El trámite procesal así lo demuestra. No hemos de intervenir con ese juicio porque el error, de haberse cometido, no fue sustancial.

### III

La parte apelante alega como segundo error que el Tribunal de Primera Instancia incidió al apreciar la prueba oral vertida en el juicio. Argumenta que, aun sin el testimonio de la testigo que no pudieron presentar, se demostró por preponderancia de la prueba todos los hechos aseverados en la demanda. A esos efectos, la parte apelante arguye que el Tribunal de Primera Instancia sólo hizo referencia en su sentencia a la falta de credibilidad de la apelante respecto al incidente relacionado con el maltrato verbal e intento de agresión por parte del señor Oscar Otero Colón, al darle entera credibilidad al testimonio del señor Milton Garced sobre ese asunto. Indica, no obstante, que en ningún otro lugar de la sentencia el tribunal *a quo* hizo expresión alguna de falta de credibilidad en cuanto al resto del testimonio de la apelante.

Como foro apelativo, no debemos preguntarnos si esta prueba era suficiente para probar de manera preponderante que la apelante fue discriminada y hostigada, como se alega en la apelación. De la prueba reseñada surge que no estamos ante una situación de ausencia de prueba, sino de credibilidad de la prueba presentada. Y como sabemos, es norma reiterada que un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haga el juzgador de los hechos, a menos que medie pasión, prejuicio, parcialidad o error manifiesto. *Pérez v. Morales*, res. el 28 de septiembre de 2007, 172 D.P.R. ____ (2007), **2007 J.T.S. 176**, a la pág. 208. Los jueces de primera instancia son quienes están en mejor posición de aquilatar la prueba, por lo que su apreciación merece gran respeto y deferencia por parte de los foros apelativos. *McConnell v. Palau*, 161 D.P.R. 734, 750 (2004). Solamente se puede intervenir con estas conclusiones cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba. No es ése el caso ante nos.

Si bien es cierto que en su sentencia el Tribunal de Primera Instancia sólo hizo referencia a la falta de credibilidad del testimonio de la apelante Acosta respecto a un sólo incidente, también es cierto que determinó que *"no se evidenció patrón de persecución contra la señora Acosta"*. [4] Asimismo, el tribunal sentenciador no halló parcialidad alguna de parte de la directora en cuanto a la entrega de materiales ni en cuanto al horario flexible. [5] En cuanto al incidente de la agresión de las estudiantes, el Tribunal de Primera Instancia determinó que ambas fueron declaradas incursas en las faltas imputables.

De igual forma, el tribunal *a quo* tomó en consideración que la apelante se querelló contra la directora del plantel escolar ante del Departamento de Educación y que el Secretario de Educación no encontró causa para continuar con la querella. El foro sentenciador determinó, además, que la apelante tenía problemas interpersonales

con sus ex compañeros de la Escuela Andrés Valcárcel, en específico, con la señora Sandra Muñiz, madre de la estudiante accidentada que requería un acomodo razonable en la clase de educación física. En fin, de lo anterior surge que el Tribunal de Primera Instancia descartó todas las alegaciones de hostigamiento, discrimen y persecución aducidas en la demanda.

Aunque no surge expresamente de la sentencia, implícitamente se puede colegir que el tribunal *a quo* le dio credibilidad a la prueba oral presentada por la parte apelada y resolvió de conformidad con esa apreciación. Aún más, el Tribunal de Primera Instancia determinó que la parte apelante no probó la conducta culposa o negligente requerida por el Art. 1802 del Código Civil, ni los daños reclamados. No tenemos criterios para alterar ese juicio.

Finalmente, la parte apelante aduce que por anotarse la rebeldía a la señora Rivera en su carácter personal, al menos, el Tribunal de Primera Instancia debió dictar sentencia por las alegaciones contra ésa. No obstante, ese planteamiento carece de méritos. El tribunal sentenciador tuvo ante sí amplia prueba para derrotar las afirmaciones de la demanda, las que, aunque estuviesen bien alegadas, no fueron sostenidas por la prueba de la parte apelante.

Resolvemos que el segundo error señalado tampoco se cometió.

## IV
Por los fundamentos expresados, se confirma la sentencia apelada.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 114

1. Por haberse presentado querella al amparo de la Ley de Menores de Puerto Rico, 34 L.P.R.A. secs. 2201 *et seq*, omitimos sus nombres.

2. Previo a la presentación de su demanda, en mayo de 1999, la señora Acosta presentó una querella formal en contra de la directora de la escuela ante el Departamento de Educación. Posteriormente, la señora Acosta presentó otra querella por negársele materiales escolares y hacer caso omiso a sus reclamos para el mejoramiento profesional. Por existir este trámite administrativo ante la agencia, el 3 de enero de 2002, el Tribunal de Primera Instancia paralizó los procedimientos judiciales hasta tanto se resolviera la querella administrativa, cuyo trámite administrativo terminó el 2 de julio de 2002 con una resolución en la que se dictaminó que la parte querellada debía hacer todas las gestiones pertinentes para cumplir con varias secciones del Convenio Colectivo. La resolución administrativa no hizo determinaciones sobre discrimen o trato indebido de la directora hacia la querellante.

3. Alegó que había un compañero maestro de educación física nuevo, señor Adalberto Rodríguez, al que le habían concedido un horario flexible porque tenía una propuesta para sacar a los estudiantes a las calles, pero nunca se ofreció evidencia alguna sobre esa propuesta. La testigo indicó que lo que realmente sucedía era que el señor Rodríguez tenía un trabajo a tiempo parcial en la Escuela Bárbara Ann y entraba a las dos y media de la tarde. La señora Acosta se quejó de esta situación ante la señora Medero y esta última le planteó el asunto a la directora, quien se mantuvo en su posición.

4. Determinación de hechos número ocho de la sentencia. Apéndice de la parte apelante, a la pág. 3.

5. Determinación de hechos número trece de la sentencia. Apéndice de la parte apelante, a la pág. 4.